1   Jamie H. Kitano (SBN: 268078)
    jkitano@shb.com
2   SHOOK, HARDY & BACON L.L.P.
    1 Montgomery, Suite 2700
3   San Francisco, California 92614-2546
    Telephone:  415.544.1900
4   Facsimile:   415.391.0281

5   Douglas W. Robinson (SBN: 255909)
    dwrobinson@shb.com
6   Tony M. Diab (SBN: 277343)
    tdiab@shb.com
7   SHOOK, HARDY & BACON L.L.P.
    Jamboree Center
8   5 Park Plaza, Suite 1600
    Irvine, California 92614-2546
9   Telephone:  949.475.1500
    Facsimile:   949.475.0016
10
    Peter Strand (*pro hac vice*)
11  pstrand@shb.com
    Angel D. Mitchell (*pro hac vice*)
12  amitchell@shb.com
    Chrissie Guastello (*pro hac vice*)
13  cguastello@shb.com
    Chris Dove (*pro hac vice*)
14  cdove@shb.com
    SHOOK, HARDY & BACON, L.L.P.
15  2555 Grand Blvd.
    Kansas City, MO 64108
16  Telephone:  816.474.6550
    Facsimile:   816.421.5547
17
    Attorneys for Defendants ALSTOM, S.A., ALSTOM Grid, Inc.,
18  Psymetrix Ltd., and ALSTOM Limited

19            UNITED STATES DISTRICT COURT

20     CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

21

22  ELECTRIC POWER GROUP, LLC, , )   Case No. 12-06365 JGB (RZx)
                                  )
23            Plaintiff,          )   **DEFENDANTS' NOTICE OF**
                                  )   **MOTION AND MOTION FOR**
24  v.                            )   **SUMMARY JUDGMENT OF**
                                  )   **INVALIDITY AND NON-**
25  ALSTOM, S.A., ALSTOM GRID, INC., )   **INFRINGEMENT; MEMORANDUM**
    PSYMETRIX   LTD.,   and   ALSTOM )   **OF POINTS AND AUTHORITIES**
26  LIMITED, ,                     )
                                  )   **CONDITIONALLY UNDER SEAL**
27            Defendants.         )
                                  )   Date:        December 22, 2014
28  _____ )   Time:        9:00 a.m.

                                1

|  | | Courtroom: | 1 |
|---|---|---|---|
| 1 | ALSTOM, S.A., ALSTOM GRID, INC., ) | Judge: | Hon. Jesus Bernal |
| 2 | PSYMETRIX LTD., and ALSTOM )<br>LIMITED,, ) | | |
| 3 | Counterclaimants, ) | | |
| 4 | v. ) | | |
| 5 | ELECTRIC POWER GROUP, LLC , ) | | |
| 6 | Counterdefendants. ) | | |

## DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY AND NON-INFRINGEMENT

PLEASE TAKE NOTICE that on December 22, 2014, at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 1 of the above-referenced Court, located at 3470 Twelfth Street, Riverside, CA 92501, Defendants Alstom S.A., Alstom Grid, Inc., Psymetrix Limited, and Alstom Limited ("Defendants") will and hereby do move this Court, pursuant to Federal Rule of Civil Procedure 56, for an order granting summary judgment on the following grounds:

(1)     the asserted claims of U.S. Patent Nos. 7,233,843, 8,060,259, and 8,401,710 (respectively the '843, '259 and '710 patents or collectively the asserted patents) are invalid under 35 U.S.C. § 101 for lack of patent-eligible subject matter,

(2)     the asserted claims are invalid under 35 U.S.C. § 112 as indefinite,

(3)     Defendants have not directly infringed the asserted patents,

(4)     Defendants have not indirectly infringed the asserted patents at least because (a) Plaintiff Electric Power Group, LLC ("EPG") cannot prove underlying infringement by nonparty customers, and (b) for any actions taken prior to the following dates, Defendants lacked the essential element of knowledge of the '843 patent prior to December 9, 2009, of the '259 patent prior to July 25, 2012, and of the '710 patent prior to June 13, 2013.

The grounds for this motion include that (1) the asserted claims are directed to an abstract idea and do not contain an inventive concept sufficient to transform the claimed abstract idea into patent-eligible subject matter; (2) the asserted claims rely on indefinite claims that fail to inform with reasonable certainty the scope of the invention; (3) Plaintiff Electric Power Group, LLC ("EPG") cannot meet its summary judgment burden to raise a genuine issue of material fact regarding essential elements and claim limitations to show that Defendants have directly or infringed the asserted claims, nor can EPG correlate Defendants' alleged infringing actions to points in time when they had knowledge of the respective asserted patents.

The motion is based upon this Notice and Motion, the attached Memorandum of Points and Authorities, the pleadings and records on file in this action, and upon any additional evidence and argument that may be presented before or at the hearing of this motion.

This motion is made following the conference of counsel on October 27, 2014, pursuant to L.R. 7 3.

Date: November 3, 2014

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

By: _____
      Angel D. Mitchell
      (admitted *pro hac vice*)
Attorneys for Defendants ALSTOM, S.A., ALSTOM Grid, Inc., Psymetrix Ltd., and ALSTOM Limited

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 12-06365 JGB (RZx)

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................... 1

II.     THE ASSERTED CLAIMS ARE INVALID AS FAILING TO MEET
        THE THRESHOLD REQUIREMENT OF PATENT ELIGIBILITY ........... 2

        A.   Legal Standards for Patent Eligible Subject Matter ............................ 2

        B.   The Asserted Claims are All Directed to an Abstract Idea ................. 4

        C.   The '843 Patent Does Not Contain a Sufficient "Inventive
             Concept" ................................................................................. 5

             1.     Independent Claim 1 ...................................................... 5

             2.     Claims 4, 7, 9, 12, and 19 Contain No Inventive Concept ........ 6

             3.     Asserted Claim 24 Contains No Inventive Concept ................. 7

        D.   The '259 Patent Does Not Contain a Sufficient "Inventive
             Concept" ................................................................................. 7

             1.     Claims 1 & 5 Contain No Inventive Concept ........................... 7

             2.     Claims 18 and 21 Contain No Inventive Concept .................... 8

             3.     Claims 38, 49, and 53 Contain No Inventive Concept ............. 9

        E.   The '710 Patent Does Not Contain a Sufficient "Inventive
             Concept" ................................................................................. 10

III.    THE ASSERTED CLAIMS ARE INVALID AS INDEFINITE ................. 11

        A.   Legal Standard for Indefiniteness .......................................... 11

        B.   The Monitored "metrics" Claim Terms are Indefinite ...................... 12

        C.   The "applications" Recited in Claim 12 of the '843 Patent and
             Claim 38 of the '259 Patent are Indefinite ............................... 13

IV.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT
        BECAUSE PLAINTIFF CANNOT PROVIDE EVIDENCE THAT
        DEFENDANTS INFRINGE THE ASSERTED PATENTS ...................... 14

        A.   Technology Background ....................................................... 14

        B.   EPG Cannot Show That Defendants Directly Infringe ..................... 16

             1.     Legal Standard for Direct Infringement .................................. 16

             2.     EPG Cannot Show that Defendants Themselves Have
                    Practiced Systems or Methods Using the Hardware or Data
                    Feeds Required by the Asserted Claims ................................... 16

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 12-06365 JGB (RZx)

C.    EPG Cannot Show that Defendants Indirectly Infringe ..................... 17

          1.    Legal Standards for Indirect Infringement .............................. 17

          2.    EPG Cannot Show that Customers Have Installed and
                Configured the Accused Software to Meet the Asserted
                Claim Limitations ..................................................................... 18

D.    Defendants Are Entitled to Summary Judgment that They Did Not
      Indirectly Infringe the Asserted Patents Prior to the Date of Having
      Actual Knowledge ............................................................................ 22

V.    CONCLUSION ........................................................................................ 23

1

## TABLE OF AUTHORITIES

2
                                                                                    **Page(s)**

CASES
3

4  *Accenture Global Servs., GmbH v. Guidewire Software, Inc.,*
      728 F.3d 1336 (Fed. Cir. 2013) ...............................................................2, 9
5
   *ACCO Brands, Inc. v. ABA Locks Mfg. Co.,*
6     501 F.3d 1307 (Fed. Cir. 2007) ..................................................................17

7  *Alice Corp. v. CLS Bank Int'l,*
      134 S. Ct. 2347 (2014)............................................ 1, 2, 3, 4, 5, 6, 7, 23
8

9  *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.,*
      No. 1:10CV910, 2014 WL 5430956 (E.D. Val. Oct. 24, 2014).......................1, 6
10

11 *Aro Mfg. Co. v. Convertible Top Replacement Co.,*
      365 U.S. 336 (1961)........................................................................18
12

13 *buySAFE, Inc. v. Google, Inc.,*
      765 F.3d 1350 (Fed. Cir. 2014) ..................................................... 1, 2, 4
14

15 *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.,*
      289 F.3d 801 (Fed. Cir. 2002)......................................................16
16

17 *Comcast IP Holdings I, LLC v. Sprint Communications Co.,*
      No. CV 12-205-RGA, 2014 WL 3542055 (D. Del. July 16, 2014) ....................1
18

19 *Cordis Corp. v. Boston Scientific Corp.,*
      561 F.3d 1319 (Fed. Cir. 2009) ..................................................12
20

21 *Cyberfone Systems, LLC v. CNN Interactive Group, Inc.,*
      558 Fed. Appx. 988 (Fed. Cir. 2014)..................................................2
22

23 *CyberSource Corp. v. Retail Decisions, Inc.,*
      654 F.3d 1366 (Fed. Cir. 2011) ..................................................9
24

25 *Diamond v. Diehr,*
      450 U.S. 175 (1981)................................................................ 3, 23, 4
26

27 *DietGoal Innovations LLC v. Bravo Media LLC,*
      No. 13 CIV 8391, 2014 WL 3582914 (S.D.N.Y. July 8, 2014).......................1, 7

*Digitech Image Techs., LLC v. Electronics for Imaging, Inc.*,
    758 F.3d 1344 (Fed. Cir. 2014) ...................................................................2

*Eclipse IP LLC v. McKinley Equipment Corp.*,
    No. CV 14-154-GW, 2014 WL 4407592 (C.D. Cal. 2014)................................1

*Enzo Biochem, Inc. v. Applera Corp.*,
    599 F.3d 1325 (Fed. Cir. 2010) ................................................................12

*Every Penny Counts, Inc. v. Wells Fargo Bank, N.A.*,
    No. 8:11-CV-2826, 2014 WL 4540319 (M.D. Fla. Sept. 11, 2014) ...................1

*Exigent Tech. v. Atrana Solutions, Inc.*,
    442 F.3d 1301 (Fed. Cir. 2006) ................................................................16

*Exxon Research & Eng'g Co. v. United States*,
    265 F.3d 1371 (Fed. Cir. 2001) ................................................................12

*Fujitsu Ltd. v. Netgear Inc.*,
    620 F.3d 1321 (Fed. Cir. 2010) ......................................................... 18, 22

*Global Tech Appliances, Inc. v. SEB S.A.*,
    131 S. Ct. 2060 (2011)............................................................. 17, 18, 22

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014) ......................................................... 13, 14

*Kyocera Wireless Corp. v. ITC*,
    545 F.3d 1340 (Fed. Cir. 2008) ................................................................18

*Loyalty Conversion Systems Corp. v. Am. Airlines, Inc.*,
    No. 2:13-CV-655, 2014 WL 4364848 (E.D. Tex. Sept. 3, 2014) ...................1, 7

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ................................16

*McRo, Inc. v. Sony Computer Entertainment Am., LLC*,
    No. CV 14-383-GW 2014 WL 5419425 (C.D. Cal. Sept. 22, 2014) ...................1

*Minn. Mining & Mfg. Co. v. Chemque, Inc.*,
    303 F.3d 1294 (Fed. Cir. 2002) ................................................................18

*Monsanto Co. v. Syngenta Seeds, Inc.*,
    503 F.3d 1352 (Fed. Cir. 2007) ................................................................16

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014) ............................................................ 12, 14

*Novartis Pharm. Corp. v. Eon Labs Mfg., Inc.*,
    363 F.3d 1306 (Fed. Cir. 2004) ...........................................17

*Open Text S.A. v. Alfresco Software Ltd.*,
    No. 13-CV-04843-JD, 2014 WL 4684429 (N.D. Cal. Sept. 19, 2014)...............1

*Planet Bingo, LLC v. VKGS LLC*,
    576 Fed. Appx. 1005 (Fed. Cir. 2014)...................................... 1, 2, 7

*Praxair, Inc. v. ATMI, Inc.*,
    543 F.3d 1306 (Fed. Cir. 2008) .............................................12

*Tech. Licensing Corp. v. Videotek, Inc.*,
    545 F.3d 1316 (Fed. Cir. 2008) .............................................16

*Toshiba Corp. v. Imation Corp.*,
    681 F.3d 1358 (Fed. Cir. 2012) .............................................18

*Vita–Mix Corp. v. Basic Holding, Inc.*,
    581 F.3d 1317 (Fed. Cir. 2009) .............................................18

*Walker Digital, LLC v. Google, Inc.*,
    2014 WL 4365245 (D. Del. Sept. 3, 2014)......................................1

*Wolf v. Capstone Photography, Inc.*,
    No. 2:13-CV-09573, slip op. (C.D. Cal. Oct. 28, 2014).......................1

**STATUTES**

35 U.S.C. § 101 .....................................................................2, 11

35 U.S.C. § 112 ........................................................................11

35 U.S.C. § 112, ¶ 2 ............................................................. 11, 12

35 U.S.C. § 271(c)....................................................................18

v

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   __INTRODUCTION__

The Court's analysis can begin and end with the threshold issue it must decide as a matter of law: the asserted claims are directed to patent-ineligible subject matter. In *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), a unanimous Supreme Court announced that its test for patent-eligible subject matter applies equally to computer-implemented inventions.   Since *Alice Corp.*, the Federal Circuit and district courts have invalidated numerous patents materially indistinguishable from those here—namely, abstract ideas recited at a high level of generality using generic computer components.[1]   Monitoring the electric power grid is conventional technology, and the claims add no technological advance.   They merely describe, at a high level of generality, data retrieval from a wide-area network that includes data storage, data processing, and displaying the results.

If the Court proceeds beyond that threshold inquiry, Defendants are entitled to summary judgment of invalidity and non-infringement.   The indefiniteness of certain claim terms, which renders them invalid, only reinforces their abstract breadth.   And EPG cannot show that the accused systems have been installed and configured in ways that infringe, nor can EPG correlate Defendants' accused actions to a time when they had knowledge of the asserted patents, particularly the two later-issued patents.

---

[1] *See generally, e.g., buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014); *Planet Bingo, LLC v. VKGS LLC*, 576 Fed. Appx. 1005 (Fed. Cir. 2014); *McRo, Inc. v. Sony Computer Entertainment Am., LLC*, No. CV 14-383-GW 2014 WL 5419425, at *1 (C.D. Cal. Sept. 22, 2014); *Open Text S.A. v. Alfresco Software Ltd.*, No. 13-CV-04843-JD, 2014 WL 4684429, at *1 (N.D. Cal. Sept. 19, 2014); *Eclipse IP LLC v. McKinley Equipment Corp.*, No. CV 14-154-GW, 2014 WL 4407592, at *2 (C.D. Cal. 2014); *Wolf v. Capstone Photography, Inc.*, No. 2:13-CV-09573, slip op. at 1-25 (C.D. Cal. Oct. 28, 2014); *Walker Digital, LLC v. Google, Inc.*, 2014 WL 4365245, at *1 (D. Del. Sept. 3, 2014); *Every Penny Counts, Inc. v. Wells Fargo Bank, N.A.*, No. 8:11-CV-2826, 2014 WL 4540319, at *2 (M.D. Fla. Sept. 11, 2014); *DietGoal Innovations LLC v. Bravo Media LLC*, No. 13 CIV 8391, 2014 WL 3582914, at *5 (S.D.N.Y. July 8, 2014); *Loyalty Conversion Systems Corp. v. Am. Airlines, Inc.*, No. 2:13-CV-655, 2014 WL 4364848, at *5 (E.D. Tex. Sept. 3, 2014); *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, No. 1:10CV910, 2014 WL 5430956, at *1 (E.D. Val. Oct. 24, 2014); *Comcast IP Holdings I, LLC v. Sprint Communications Co.*, No. CV 12-205-RGA, 2014 WL 3542055, at *4 (D. Del. July 16, 2014).

## II.   THE ASSERTED CLAIMS ARE INVALID AS FAILING TO MEET THE THRESHOLD REQUIREMENT OF PATENT ELIGIBILITY

As set forth below, the asserted claims are invalid for failing to claim patent-eligible subject matter.   These claims are drawn to the fundamental concept of receiving, storing, processing, and displaying data from a wide-area network.   They contain no inventive concept.   They disclose no technological advance in data, algorithms, programming logic, components, or network architecture.   They simply describe a ubiquitous computerized environment applied to a particular technological environment, i.e., monitoring the electric power grid.

### A.   Legal Standards for Patent Eligible Subject Matter

Patent eligibility under 35 U.S.C. § 101 is a question of law.   *Cyberfone Systems, LLC v. CNN Interactive Group, Inc.*, 558 Fed. Appx. 988 (Fed. Cir. 2014).   It is appropriate for the Court's resolution on summary judgment.   *See, e.g.*, *Planet Bingo, LLC*, 576 Fed. Appx. at 1005 (affirming summary judgment of ineligible subject matter); *Digitech Image Techs., LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir. 2014) (same); *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336 (Fed. Cir. 2013) (same).

To be patent eligible, a claimed invention must be directed to a "new and useful process, machine, manufacture, or composition of matter, or . . . improvement thereof." 35 U.S.C. § 101.   The Supreme Court has interpreted § 101 to exclude "laws of nature, natural phenomena, and abstract ideas, no matter how groundbreaking, innovative, or even brilliant.'" *buySAFE, Inc.*, 765 F.3d at 1352.   The concern that drives this exclusionary principle is one of preemption inasmuch as laws of nature, natural phenomena, and abstract ideas are the basic tools of scientific and technological work, so monopolizing these tools through the grant of a patent right would tend to impede innovation more than it would tend to promote it.   *Alice Corp.*, 134 S. Ct. at 2354.   Patents that claim these basic building blocks of human ingenuity risk disproportionately tying up the use of the underlying ideas. *Id.*

1    A two-step process applies to determining whether a claim is directed to patent-
2    eligible subject matter. *Id.* at 2355. At step one, the court evaluates the claims "on
3    their face" to determine to which "concept" the claims are "drawn." *Id.* at 2356. "The
4    'abstract ideas' category embodies the long-standing rule that an idea of itself is not
5    patentable." *Id.* at 2355 (quotation omitted). For example, in *Gottschalk v. Benson*,
6    the Court rejected patent claims involving an algorithm for converting binary-coded
7    decimal numerals into pure binary form because the patent was "in practical effect . . .
8    a patent on the algorithm itself." 409 U.S. 63, 71-72 (1972). In *Parker v. Flook*, the
9    Court held that a method for updating alarm limits that used a mathematical formula
10   in a catalytic conversion process was a patent-ineligible abstract idea. 437 U.S. 584,
11   594-95 (1978). *See also Alice Corp.*, 134 S. Ct. at 2356 (idea of intermediated
12   settlement using a computer).

13   At step two, the court "search[es] for an inventive concept—i.e., an element or
14   combination of elements that is sufficient to ensure that the patent in practice amounts
15   to significantly more than a patent upon the ineligible concept itself." *Id.* at 2355.
16   The court looks at the invention as described by the claims, rather than the further
17   detail given in the specification. *Id.* at 2359. Appending "conventional steps,
18   specified at a high level of generality" or reciting the use of a "generic computer" does
19   not transform the claimed abstract idea into a patent eligible invention. *Id.* at 2358.
20   Rather, the claim must include additional features to ensure that the claim is more than
21   a drafting effort designed to monopolize the abstract idea. *Id.* at 2357. Simply stating
22   the abstract idea and adding the words "apply it" is not enough for patent eligibility,
23   nor is limiting the use of the abstract idea to a particular technological environment.
24   *Id.* at 2358. "Stating an abstract idea while adding the words 'apply it with a
25   computer' simply combines those two steps, with the same deficient result." *Id.* One
26   example of a computer-implemented process that the Supreme Court has found patent
27   eligible at step two is *Diamond v. Diehr*, in which the claim recited an improved

28

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 12-06365 JGB (RZx)

1   technological process for curing synthetic rubber that used a mathematical formula

2   and a programmed computer.  450 U.S. 175, 185-188 (1981).  Thus, the claim must

3   incorporate the abstract idea into an unconventional, technological improvement in the

4   "physical realm."  *Alice*, 134 S. Ct. at 2357; *buySAFE, Inc.*, 765 F.3d at 1353.

5   **B.    The Asserted Claims are All Directed to an Abstract Idea**

6   Monitoring the electric power grid has long been a fundamental practice in the

7   electric utility industry.  The background of the '843 patent explains that a number of

8   organizations are "responsible for overseeing . . . power generation, transmission, and

9   distribution activities," including thousands of utilities and generators, "22 Reliability

10  Coordinators, and 153 Control Areas (CAs) in the United States" [SUF 5].  "All these

11  entities at various different levels are involved in . . . monitoring and control in a

12  power grid" [SUF 6].  The alleged novelty of the claimed invention is providing a

13  "single integrated system that can be used to monitor and manage the electric power

14  grid in real-time across all of the different elements of the power system"—e.g., an

15  "information management system for the power grid, which is integrated across

16  multiple business systems, companies and Control Areas to manage the security,

17  timeliness, accuracy or accessibility of information for grid operations, reliability,

18  market operations and system security" [SUF 7].

19  EPG asserts claims 4, 7, 9, 12, 19, and 24 of the '843 patent; claims 1, 5, 18, 21,

20  38, 49, and 53 of the '259 patent; and claims 9, 12, and 17 of the '710 patent.  These

21  claims are set forth in their entirety in SUF 8-35.  As can be seen, these claims recite

22  receiving data, storing data, applying generically described programming to the data,

23  and displaying the data and/or computational results.  The claims recite generic

24  hardware components and software such as "monitor computer," "display computer,"

25  "graphical user interface" (GUI), "platform," "database," and "application."  As such,

26  all asserted claims threaten to preempt the use of basic tools of scientific and

27  technological work because they risk disproportionately tying up the use of the basic

28

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 12-06365 JGB (RZx)

building blocks of power grid monitoring such as computers, displays, GUIs, data obtained from the grid, and applications to make meaningful use of that data. The claimed systems and methods are thus "so abstract and sweeping" as to cover any and all uses of the underlying abstract idea in the field of power grid monitoring. *See Benson*, 409 U.S. at 68.

### C.  The '843 Patent Does Not Contain a Sufficient "Inventive Concept"

#### 1.  Independent Claim 1

Claim 1 is the sole independent claim of the '843 patent upon which all other claims depend.[2] It recites a real-time electric power grid monitoring system in which a "monitor computer" monitors various metrics from control areas and stores them in a database, a "display computer" displays a visualization of the metrics, and a "display computer" in one control area is "adapted to enable" an operator in one control area to monitor another control area [SUF 9]. Thus, the fundamental concept to which this claim is drawn is monitoring the power grid via receiving, storing, and displaying data in a ubiquitous computerized environment. As such, it threatens to preempt the basic building blocks of power grid monitoring systems.

Turning to step two of the *Alice Corp.* test, claim 1 recites no inventive concept sufficient to ensure that the patent amounts to significantly more than a patent upon the fundamental concept itself. The claim generally describes the system as "real-time," recites monitoring metrics from multiple control areas, and a display computer that is "adapted to enable" visibility into another control area. But the claim discloses no technological advance in systems integration. It simply recites a "monitor computer" and a "display computer." These high-level generalities fail to disclose any technological advance in achieving such a live, integrated system. The claim effectively states the idea of a real-time system using data from a wide-area network "while adding the words 'apply it with a computer,'" which is deficient under *Alice*

---

[2] EPG asserts claims 4, 7, 9, 12, 19 and 24 of the '843 patent.

*Corp.*, 134 S. Ct. at 2358; *see, e.g., id.* at 2355-60 (claims reciting "data processing system," "communications controller," and "data storage unit" were not patentable).

Indeed, claim 1 is remarkably similar to one of the patents found to claim patent-ineligible subject matter in *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, No. 1:10cv910, 2014 WL 5430956, at *10-*11 (E.D. Va. Oct. 24, 2014). There, the district court found that claims reciting "collecting . . . information in real-time from a plurality of network devices at a plurality of layers," filtering and aggregating the information, completing a plurality of data records from that information, storing the data records in a database, submitting queries to the database for retrieving information, and outputting a report based on queries were not directed to patent-eligible subject matter. *Id.*

### 2.    Claims 4, 7, 9, 12, and 19 Contain No Inventive Concept

Asserted claims 4, 7, 9, 12, and 19 essentially recite various ways of: (1) processing the data (i.e., "metrics"), and (2) visualizing the results.

These claims recite no technological advances in data processing. Claims 4 and 12 each describe an "application" at a high level of generality—e.g., real-time monitoring of system vulnerability, application that monitors metrics from the area the operator desires to monitor, etc. [SUF 10, 13]. Claim 7 depends on claim 6, which recites a computer that "performs historical tracking, predictions or actions," including using thresholds, violations and alarms [SUF 11]. Again, these data processing techniques described at a high level of generality do not disclose any technological advances in computing historical tracking, predictions, actions, or triggering alarms based on violations of thresholds. *See Flook*, 437 U.S. at 585 (recognizing that when process variables exceed a predetermined "alarm limit," an alarm may signal the presence of an abnormal condition). The "potential system faults" recited in claim 19 [SUF 14] implicitly rely on thresholds, violations, and alarms to identify the abnormal operating conditions that constitute the "system fault." In other words, the asserted

claims all recite various data processing techniques and say "do it with a computer" without disclosing any unconventional, technological improvement.   None of the claims even rise to the level of detail in computerized processing and programming found insufficient in *Benson*, *Flook*, or *Alice* or its progeny.

Similarly, the claims recite no technological advances in displays, visualizations, or user interfaces.   Claim 7 recites a monitor that "displays a visualization" of the data processing logic recited in claim 6 [SUF 11].   Claim 9 appends limitations involving various types of conventional displays—i.e., geographic displays (e.g., maps), data panels (e.g., graphs and charts), and text panels (e.g., words) [SUF 12].   Claim 19 appends a graphic representation of the proximity to potential system faults [SUF 14].   But the ideas of user interfaces and visual displays—e.g., visually displaying the results of data processing—can be found on any general purpose computer and "are far more 'routine' and 'conventional' than the computerized applications of the economic concepts invalidated in . . . *Alice*." *DietGoal Innovations LLC*, 2014 WL 3582914, at *15; *cf. Planet Bingo, LLC*, 576 Fed. Appx. at 1006 (noting that variations between the claims included "display capabilities"); *Loyalty Conversion Systems Corp.*, 2014 WL 4364848, at *3, *8-*9 (Bryson, J.) (claims involving graphical user interface).

### 3.      Asserted Claim 24 Contains No Inventive Concept

Asserted claim 24 is merely the system recited in claim 1 operated by a reliability coordinator [SUF 15].   But the specification of the '843 patent explains that reliability coordinators were already monitoring the electric power grid [SUF 5].   This claim therefore provides no technological advance.

### D.      The '259 Patent Does Not Contain a Sufficient "Inventive Concept"

### 1.      Claims 1 & 5 Contain No Inventive Concept

In addition to the concepts discussed above for the '843 patent, claim 1 of the '259 patent appends the following additional limitations [SUF 17]:

- data streams of synchronized phasor measurements,
- performing data processing and computational algorithms described at a high level of generality such as "derives from the . . . data streams . . . dynamic stability metrics including phase angles, damping, oscillation modes, and sensitivities"; monitoring, tracking, historical, prediction, and summary data; and accumulating and updating metrics, and
- a graphical user interface (i.e., display) "for concurrently displaying the at least two different categories of data concerning the metrics" and "concurrent visualization of a plurality of metrics."

The patent specification itself recognizes that synchronized phasor measurements are a known data input in an electric power grid monitoring system [SUF 3]. So is applying data processing to those measurements, and using algorithms, applications, and computations [SUF 3]. Claim 1 of the '259 does not purport to provide any technological advance in data processing or mathematical equations that use phasor measurements. Furthermore, displaying multiple forms of data at once on the same user interface is routine, conventional technology.

Claim 5 depends on both claims 1 and 2 [SUF 18]. Claim 2 merely recites a computer that "analyzes the monitored metrics" and a graphical user interface that "displays results" [SUF 19]. Of course, the generalized idea of analyzing and displaying data is routine, conventional technology. Claim 5 recites a "monitor computer" that is "configured to transfer the results of the analysis to another computer system" [SUF 20]. But transferring data from one computer to another also is routine, conventional technology. Claim 5 contains no inventive concept.

### 2.      Claims 18 and 21 Contain No Inventive Concept

EPG asserts claims 18 and 21, which depend on independent claim 17. Claim 17 is a method claim that largely corresponds to claim 1. It appends the following additional steps:

- "analyzing the displayed data,"
- "providing summary information," and
- storing the data "for replay and review to perform power grid system performance assessment, event diagnostics, root cause analysis of events and situational assessment of dynamic stability."

The first two limitations above are abstract and meaningless. The first does not identify any way in which the data is to be analyzed. The second does not identify what data is to be summarized, or where or how it is to be provided. The third limitation adds a data storage feature, which is a conventional feature. The various data review functions are recited at a high level of generality with no disclosure of technological advances in engineering to carry out these functions. *Cf. Accenture Global Servs., GmbH*, 728 F.3d at 1345 (finding claims directed to generating tasks based on rules to be completed upon the occurrence of an event to be not patentable).

Dependent claim 18 similarly provides no technological advance. It appends the additional limitation of identifying monitored data that crosses a threshold [SUF 23]. It does not disclose any inventive concept in setting thresholds, which is routine and conventional technology involved in alarm systems. *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371 (Fed. Cir. 2011) (describing *Flook* as involving "alarm limits" that were threshold values which, if exceeded, would trigger a warning alarm). Dependent claim 21 essentially claims a "zoom" feature [SUF 24], which also is routine, conventional display technology.

### 3.    Claims 38, 49, and 53 Contain No Inventive Concept

EPG asserts claims 38, 49, and 53, which depend on independent claim 22. Claim 22 largely reiterates limitations discussed above [SUF 26]. It appends the additional steps of "derived metrics" that include "at least one of reactive reserve margin, power transfer angle, voltage/volt-ampere reactive (VAR), frequency response, sensitivities and/or combinations thereof." Again, the patent does not

1    disclose that these computations ("derived metrics") are inventive or, if they are, the
2    patent does not disclose any algorithm or mathematical equation used to compute
3    them.  As such, claim 22 does not introduce any technological advance.

4        Claims 38, 49, and 53 merely reiterate limitations already discussed above.
5    Specifically, claim 38 of the '259 patent is materially identical to claim 12 of the '843
6    patent [SUF 27].  Such a generic, user-defined "application" that performs undefined
7    programming on metrics relating to areas "which the operator desires to monitor" adds
8    no meaningful limitation that provides an inventive concept.  Claim 49 of the '259
9    patent recites "abnormal operating conditions" [SUF 28].  But identifying abnormal
10   operating conditions implicates the same rules, thresholds, and alarms as claims 6, 7,
11   and 19 of the '843 patent.  As such, it provides no technological advance for
12   essentially the same reasons.  And, claim 53 of the '259 patent contains the same
13   "replay and review" post-event analysis feature recited in the final limitation of claim
14   17 of the '259 patent [SUF 29].

15       **E.    The '710 Patent Does Not Contain a Sufficient "Inventive Concept"**
16       EPG asserts claims 9, 12, and 17 of the '710 patent.  Claim 9 largely reiterates
17   the same limitations as set forth in the '843 and '259 patents, and purports to add
18   automated event detection and analysis [SUF 31].  Claim 9 recites, for example,
19   "analyzing event data and analysis of events," "automatically analyzing the events,"
20   "wherein the monitor computer is configured to detect events" and "execute event
21   detection logic, the event detection logic being configured to detect and analyze an
22   event" based on a wide variety of recited measurements and calculated metrics.  These
23   broad concepts do not disclose any logic, criteria, or programming that describes how
24   an event is supposed to be analyzed or detected.  Claim 9 also recites "other power
25   system data sources" and "non-grid data sources."  In other words, the claim recites
26   more generically described data sources.  It does not identify any inventive data

27

28

sources, or inventive ways for integrating data sources.  In short, the concepts it recites at a high level of generality do not disclose any technological advance.

Claim 12 of the '710 patent is a method claim that assembles the variety of claim limitations already discussed—e.g., receiving data, including phasor measurements; derived metrics therefrom; automated event detection and analysis; displaying results and diagnoses of events "in visuals, tables, charts, or combinations thereof"; displaying a "concurrent visualization"; "accumulating and updating . . . measurements . . . and dynamic stability metrics"; etc. [SUF 33].  The final limitation of claim 12 additionally recites a "composite indicator of reliability" that is "derived from a combination of one or more" measurements, computations of measurements, dynamic stability metrics, and non-power grid data.  In other words, the composite indicator of reliability is presumably any computation performed on any data coming into the system reported in any fashion.  The claim discloses no algorithm or programming logic for computing the composite indicator, but instead describes it at such a high level of generality that it provides no inventive concept.

Claim 17 recites a "zoom" feature [SUF 35].  Again, this is routine, conventional display technology.

## III.   THE ASSERTED CLAIMS ARE INVALID AS INDEFINITE

Defendants respectfully submit that the Court's analysis should begin and end with the threshold § 101 analysis set forth above.  Nevertheless, out of an abundance of caution, Defendants feel compelled to address remaining flaws in EPG's case that result in a finding of invalidity and non-infringement as a matter of law.  First, as set forth below, the asserted claims are invalid as indefinite under 35 U.S.C. § 112.

### A.   Legal Standard for Indefiniteness

A patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2.  A claim fails to satisfy this statutory requirement and is thus

1   invalid for indefiniteness if its language, when read in light of the specification and
2   the prosecution history, fails to inform those skilled in the art about the scope of the
3   invention with reasonable certainty.  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.
4   Ct. 2120, 2124 (2014).   This standard allows for a modicum of uncertainty, but the
5   claim must provide clear notice of what is claimed, thereby apprising the public of
6   what is still open to them.   *Id.* at 2128-29.   Thus, it is not enough that a court can
7   ascribe *some* meaning to a patent's claims.   *Id.* at 2130.   The claims, when read in
8   light of the specification and prosecution history, must provide objective boundaries
9   for those skilled in the art.  *Id.* & n.8.

10          "Indefiniteness under 35 U.S.C. § 112, ¶ 2 is an issue of claim construction and
11   a question of law."  *Cordis Corp. v. Boston Scientific Corp.*, 561 F.3d 1319, 1331
12   (Fed. Cir. 2009).   General claim construction principles apply to determining whether
13   allegedly indefinite claim language is subject to construction.  *Praxair, Inc. v. ATMI,*
14   *Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008).   Thus, the court may consider intrinsic
15   evidence consisting of the claim terms, the specification, and the prosecution history.
16   *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332-33 (Fed. Cir. 2010).   The
17   court may also consider extrinsic evidence when necessary to resolve disputes of
18   indefiniteness.  *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1376
19   (Fed. Cir. 2001).

20          **B.      The Monitored "metrics" Claim Terms are Indefinite**
21          All asserted claims of the '843 patent, claims 1 and 5 of the '259 patent, and
22   claim 9 of the '710 patent are all invalid as indefinite.   They each recite the limitation
23   of "a monitor computer for monitoring at least one of reliability metrics, power grid
24   operations metrics, generation metrics, transmission metrics, suppliers metrics, grid
25   infrastructure security metrics or market metrics" [SUF 9, 17, 18, 20, 31].   The
26   meaning of these various "metrics" terms cannot be determined from the specification

27

28
                                                       12

or the prosecution history, neither of which provides any objective boundaries to their meaning.

Particularly given the absence of any support in the specification or prosecution history, no person of ordinary skill the art could determine with reasonable certainty the objective boundaries of what is meant by the "metrics" terms. EPG's expert testified that "just about everything on a transmission line measurement is a reliability issue" [SUF 36]. He could provide no definition for the various "metrics" terms that did not overlap one another or essentially claim every possible measurement or metric that could ever be measured or monitored [SUF 37]. One of the co-inventors similarly could not define the different "metrics" [SUF 38].

EPG's expert's inability to articulate a defined boundary for these terms is consistent with other witnesses in the case. MISO's witness similarly testified that the meaning of these terms was unclear [SUF 39]. When EPG asked if PG&E monitored "grid infrastructure security metrics," PG&E's witness responded that EPG would have to "be more specific" [SUF 40]. When EPG asked PEAK if it monitored "reliability metrics" and "power grid operations metrics," PEAK testified that such information came from its "SCADA, state estimation, contingency analysis, and network sensitivities" applications [SUF 41]. Again, the "metrics" terms cannot be distinguished from one another and have a different meaning to each person asked.

## C.   The "applications" Recited in Claim 12 of the '843 Patent and Claim 38 of the '259 Patent are Indefinite

The user-defined applications recited in claim 12 of the '843 patent and claim 38 of the '259 patent also are indefinite. These claims define the recited applications in terms of the area "the operator desires to monitor." This subjective term is similar to the claim term found indefinite in *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364 (Fed. Cir. 2014). There, the claim language "unobtrusive manner that does not distract a user" was indefinite because it was facially subjective, lacked any objective boundary, depended on the "unpredictable vagaries of any one person's opinion," and

hence reflected the innovation-discouraging zone of uncertainty in which the Supreme Court warned in *Nautilus*. *Id.* at 1373-74. Like the claim language at issue in *Interval Licensing*, the claims here define the recited application in terms of the area "the operator desires to monitor." This descriptor is purely subjective and depends on the unpredictable vagaries of a particular system operator on a particular day in a particular circumstance. No objective criteria exist for a person of ordinary skill in the art to understand the scope of this claim.

## IV. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF CANNOT PROVIDE EVIDENCE THAT DEFENDANTS INFRINGE THE ASSERTED PATENTS

### A. Technology Background

Defendants sell two software solutions used by control room operators that are accused of infringement—PhasorPoint and e-terra*vision*. Specifically, EPG accuses accuses the following:

- PhasorPoint, which is a synchrophasor-based software solution,
- PhasorPoint with e-terra*vision* integration to visualize PMU data, and
- e-terra*vision* including a PMU interface to receive synchrophasor data from a PDC, such as openPDC, to visualize PMU-based data.

A 2003 Report from the Department of Energy provides a short primer on synchrophasor technologies for the non-specialist. It explains that the foundation of synchrophasor data networks are phasor measurement units (PMUs) [SUF 42]. PMUs are hardware units installed on various locations in an electric power grid such as generation substations and transmission lines [SUF 43]. PMUs measure voltage, current, and frequency multiple times a second [SUF 44]. PMUs then convert those measurements into what are called phasors [SUF 45]. A phasor is a calculated value based on the magnitude and phase angle of voltage or current waveforms [SUF 46]. The PMUs add time-stamps to the phasor values, which makes them into

synchrophasors [SUF 47]. The PMUs also convert the synchrophasor values into the standard (IEEE C37.118) data format [SUF 48].

Synchophasor data from numerous PMU units in an electric power grid are then transferred over communication networks to a phasor data concentrator (PDC) [SUF 49]. The PDC aggregates and time-aligns the synchrophasor data received from the various PMU units [SUF 50]. Once the PDC has time-aligned the data, it sends the data stream to a control room software application that processes the synchrophasor data and makes it available to control room operators [SUF 51]. An example of such a system is depicted below:



**Figure 1. Collection and flow of synchrophasor data**

[SUF 52].

### B.     EPG Cannot Show That Defendants Directly Infringe

#### 1.     Legal Standard for Direct Infringement

Plaintiff has the burden to prove infringement.   *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed. Cir. 2008).   Plaintiff must establish that the accused system or method meets each and every claim limitation either literally or under the doctrine of equivalents.   *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 812 (Fed. Cir. 2002).   The Court's infringement analysis proceeds, first, by determining the meaning and scope of the asserted patent claims.   *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370, (1996).   Second, the claims, as properly construed, must be compared to the accused system or method.   *Id.*   When examining a dependent patent claim, the Court first must conclude that all the limitations of the related independent claim have been met. *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007).

A defendant seeking summary judgment does not need to present affirmative evidence of noninfringement.   *Celotex*, 477 U.S. at 326.   Instead, it only needs to identify "specific ways" that the accused products do not infringe.   *Exigent Tech. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1309 (Fed. Cir. 2006) (following *Celotex*).   The defendant does not even have to proffer evidence that a claim element is missing; it simply has to assert "an absence of evidence" on an issue for which the patentee bears the burden of proof.   *Id.* at 1307-08 (*quoting Celotex*).   Thus, summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file show no genuine issue of any material fact.   *Id.*

#### 2.     EPG Cannot Show that Defendants Themselves Have Practiced Systems or Methods Using the Hardware or Data Feeds Required by the Asserted Claims

EPG cannot present evidence that Defendants directly infringe the asserted patents because they do not make, use, offer to sell, or sell any systems or methods that practice all of the limitations of any asserted claim.   Specifically, the asserted claims require hardware components.   For example, the asserted patents require a

"monitor computer," "display computer," "a graphical user interface coupled to the monitor computer," "the computer," "another computer system," and "a display coupled to the monitor computer." But Defendants only sell software—*e.g.*, the accused PhasorPoint and e-terra*vision* software. EPG cannot present evidence that Defendants supply any of these hardware components to the customers that have installed and configured the accused software to work at their facilities where the electric power grid monitoring actually occurs.

Similarly, the asserted patents require data feeds such as receiving "metrics," synchrophasor measurements, and a "plurality of interfaces" to other data sources. For example, the '843 patent requires a system that receives data from "a plurality of control areas . . . on a plurality of different platforms by a plurality of different business systems or companies." The '259 and '710 patents require a system that receives a "plurality of data streams" containing phasor measurements collected over a "wide area." The '710 patent further requires "a plurality of interfaces to other power system data sources" and "a plurality of interfaces to non-grid data sources." EPG cannot present evidence that Defendants provide any such data feeds to any installed system. Rather, customers configure their own data feeds using their own system infrastructure and/or through agreements with other entities.

### C.   **EPG Cannot Show that Defendants Indirectly Infringe**

#### 1.   **Legal Standards for Indirect Infringement**

To survive summary judgment, EPG must have evidence that Defendants are liable for indirect – i.e. induced or contributory – infringement. To prove induced infringement under § 271(b), Plaintiff first must show that a third party directly infringed the asserted patents. *ACCO Brands, Inc. v. ABA Locks Mfg. Co.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007); *Novartis Pharm. Corp. v. Eon Labs Mfg., Inc.*, 363 F.3d 1306, 1308 (Fed. Cir. 2004). Plaintiff next must show that Defendants had actual knowledge of the asserted patents at the time of the alleged inducement. *Global Tech*

*Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011).   Third, Plaintiff must show that Defendants knew that the induced acts resulted in infringement.   *Id.* Finally, Plaintiff must prove that Defendants had the specific intent to cause infringement by the third party. *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304-05 (Fed. Cir. 2002); *Kyocera Wireless Corp. v. ITC*, 545 F.3d 1340, 1353-54 (Fed. Cir. 2008) (citations omitted).

To prove contributory infringement under § 271(c), EPG, again, must show that a third party directly infringed the asserted patents. *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341 (1961).   Plaintiff also must prove that Defendants had actual knowledge of the patent. *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010).   In addition, Plaintiff must prove that there are no substantial noninfringing uses for the accused product. *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1362 (Fed. Cir. 2012) (citing 35 U.S.C. § 271(c)).   "[N]on-infringing uses are substantial when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Vita–Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009).

### 2.   EPG Cannot Show that Customers Have Installed and Configured the Accused Software to Meet the Asserted Claim Limitations

Plaintiff accuses eight nonparty customers of directly infringing the asserted patents: Midcontinent Independent System Operator, Inc. (MISO) (PhasorPoint only); Peak Reliability (PEAK) (PhasorPoint and e-terra*vision*); ISO New England (ISO-NE) (both); Pacific Gas & Electric Company (PG&E) (both); American Transmission Company (ATC) (both); Dominion Virginia Power (Dominion) (e-terra*vision* only); Florida Power & Light (FP&L) (e-terra*vision* only); and National Grid (PhasorPoint only).   Of those customers, EPG deposed representatives of MISO, PEAK, ISO-NE, and PG&E, who refuted that they have installed and configured their accused software in ways that meet certain claim limitations.   EPG did not depose ATC, Dominion,

FP&L, or National Grid, and therefore EPG cannot produce evidence that these customers meet the claim limitations.

> **a.     EPG Has No Evidence that PG&E, ISO-NE, FP&L, Dominion, or ATC Collect Metrics or Synchrophasor Data from the Areas Required by the Claims**

Defendants are entitled to summary judgment of no infringement for the customer installations at PG&E, ISO-NE, FP&L, Dominion, and ATC because EPG cannot show that those customers' systems are configured to monitor data from the specific geographic footprints required by asserted claims.  Specifically, all asserted claims require that the "metrics" or synchrophasor data be collected from a particular area, as follows:

- Claim 1 of the '843 patent (upon which all asserted claims of the '843 patent are dependent) recites a computer that monitors metrics "over a *plurality of control areas* of the electric power grid."  As explained in Defendants' Motion for Claim Construction, the term "control area" means *balancing authority areas as defined by NERC*.

- All asserted claims in the '259 and '710 patents require data from a *wide area*.  As explained in Defendants' Motion for Claim Construction, the term "wide area" means *a number of balancing authorities*.

- The '259 patent includes the additional limitation that the wide area includes "distinct entities."  As explained in Defendants' Motion for Claim Construction, "distinct entities" means *entities which are not co-owned or controlled*.

- The '710 patent includes the additional limitation that the wide area includes at least two elements from among control areas, transmission companies, utilities, regional coordinators, and reliability jurisdictions.

Yet EPG has no evidence that PG&E, ISO-NE, FP&L, Dominion, or ATC receive synchrophasor data from multiple balancing authority areas, from distinct entities

---

1   which are not co-owned or controlled, or from at least two transmission companies,

2   utilities, regional coordinators, and reliability jurisdictions.

3       Both PG&E and ISO-NE testified that their systems are not configured to

4   collect data from the areas required by the claims.   Specifically, EPG deposed

5   PG&E's representative, Jonathan Sykes, who testified that PG&E receives

6   synchrophasor data only from its own PMU units that are located within PG&E's own

7   geographic service area [SUF 53].   EPG also deposed ISO-NE's representative,

8   Xiaochuan Luo, who testified that ISO-NE receives synchrophasor data only from

9   PMU units in its own geographic footprint [SUF 54].   Thus, PG&E and ISO-NE are

10  not receiving data from any balancing authority areas other than their own, or from

11  distinct entities that are not co-owned or controlled, or from multiple transmission

12  companies, utilities, regional coordinators, or reliability jurisdictions.

13      Furthermore, EPG cannot meet its summary judgment burden of raising a

14  disputed fact issue as it relates to the customer installations at FP&L, Dominion, ATC,

15  or National Grid because EPG did not even depose those customers.   EPG therefore

16  has no admissible evidence from these nonparties to demonstrate that they have their

17  systems configured to meet these various limitations requiring that they collect

18  synchrophasor data from particular areas.

19      **b.**   ***EPG Has No Evidence that Any Third Party's System***
20  ***Architecture Is Configured to Operate on Plurality of***
    ***Different Platforms by a Plurality of Different Business***
21  ***Systems or Companies***

22      All asserted claims of the '843 patent require the accused systems to monitor

23  "metrics" over a *plurality of different platforms by a plurality of different business*

24  *systems or companies*.   But EPG has no evidence that any of the customers have

25  deployed their systems to meet this limitation.   MISO testified that its accused system

26  is configured to receive synchrophasor data only [SUF 55-56].   PG&E also testified

27  that it is using PhasorPoint and e-terra*vision* only for synchrophasor data [SUF 57],

28  and only to monitor its own facilities in its own geographic service area [SUF 53].

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 12-06365 JGB (RZx)

Similarly, PEAK testified that its PhasorPoint system only receives synchrophasor data [SUF 58]. ISO-NE testified that it does not even use e-terra*vision* [SUF 59] and that it deployed PhasorPoint as a synchrophasor application [SUF 60]. EPG did not depose FP&L, Dominion, ATC, or National Grid, and therefore has no evidence that any of those entities have implemented their system architectures in ways that meet this claim limitation. Thus, EPG cannot raise a disputed fact issue that any accused customer has deployed a system that meets this claim limitation.

### c. *EPG Has No Evidence that Any Customer Has Configured Its System Architecture to Have Multiple PDCs*

Defendants also are entitled to summary judgment of no infringement of the '259 and '710 patents with respect to *all* customer installations because EPG cannot show that customers have configured their system architecture to receive multiple PDC data streams. All asserted claims of the '259 and '710 patents include the limitation of "a plurality of data streams" in which each data stream comprises time-stamped "synchronized" phasor measurements collected from a wide area. As explained in more detail above, the PMU unit time-stamps the phasor data and then the PDC aggregates and "synchronizes" (time-aligns) the data from multiple PMUs [SUF 50]. Plaintiff's own expert testified that PMU data is not "synchronized" until it is processed by the PDC [SUF 61]. Thus, the data stream recited in this limitation is a data stream coming from a PDC. Consequently, this limitation requires a system in which the monitor computer receives a plurality of PDC data streams.

EPG can present no evidence that any non-party customer has configured its system architecture to include multiple PDC streams. Plaintiff deposed MISO, PEAK, PG&E, and ISO-NE. EPG did not ask PG&E, and every other representative testified that their systems have a single PDC that interfaces with their system [SUF 62-65]. Furthermore, EPG has no admissible evidence from FP&L, Dominion, ATC, or National Grid that their systems have multiple PDC streams because EPG did not depose them. EPG therefore cannot raise a disputed fact issue that this claim

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 12-06365 JGB (RZx)

1   limitation is met so as to withstand summary judgment of noninfringement of the '259

2   and '710 patents.

3       **D.    Defendants Are Entitled to Summary Judgment that They Did Not
            Indirectly Infringe the Asserted Patents Prior to the Date of Having
4           Actual Knowledge**

5           An essential element of induced or contributory infringement is knowledge of

6   the asserted patent.  *See Global Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060,

7   2068 (2011); *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010).

8           Defendants did not have knowledge of the '843 patent prior to receiving a

9   licensing demand letter from EPG dated December 9, 2009 [SUF 66].  At that time,

10  the '259 patent had not yet issued [SUF 3].  EPG has no evidence that Defendants had

11  knowledge of the '259 patent until EPG filed this lawsuit on July 25, 2012 [SUF 67].

12  At that time, the '710 patent had not yet issued [SUF 4].  EPG has no evidence that

13  Defendants had knowledge of the '710 patent until on or about the time that EPG

14  amended its complaint to assert that patent on June 13, 2013 [SUF 69, 70].

15          As "knowledge" is an essential element of indirect infringement, EPG bears the

16  burden on summary judgment to raise a disputed fact issue that correlates any actions

17  allegedly taken by Defendants to induce or contribute to customers' alleged

18  infringement to a point in time when Defendants had knowledge of each respective

19  asserted patent.  Consequently, even to the extent that EPG raises a disputed fact issue

20  that any customer installation meets the asserted claim limitations (which seems

21  unlikely), Defendants are entitled to summary judgment of no indirect infringement on

22  a patent-by-patent basis for each accused sale unless EPG can raise a disputed fact

23  issue that the particular sale occurred at a time when Defendants had knowledge of

24  that patent.   As a matter of law, Defendants cannot be liable for induced or

25  contributory infringement prior to having actual knowledge of a patent.  Thus, absent

26  EPG providing evidence that establishes such a correlation in time, Defendants are

27  entitled to summary judgment of no indirect infringement of the '843 patent for any

28

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 12-06365 JGB (RZx)

actions taken prior to December 9, 2009, of no indirect infringement of the '259 patent for any actions prior to July 25, 2012, and of no indirect infringement of the '710 patent for any actions taken prior to June 13, 2013.

## V.   CONCLUSION

The asserted patents do not pass muster under *Alice Corp. v. CLS Bank*.  The claims bear no resemblance to the level of granularity set forth in the patent claims approved in the computer-implemented invention that the Supreme Court found was directed to patent-eligible subject matter in *Diamond v. Diehr*, 450 U.S. 175 (1981). Instead, the asserted claims reflect an abstract idea (receive, store, compute, and display data) implemented with generic computers applied to a particular technological environment (e.g., monitoring the power grid).  The asserted claims therefore do not even pass the threshold test of patent eligibility.

Even if the Court's analysis were to proceed past this threshold analysis, Defendants are entitled to summary judgment of invalidity because of the indefinite, meaningless laundry list of recited "metrics" and the "applications" that are defined by the user's subjective intent—neither of which provide objective boundaries from which a person of ordinary skill in the art could ascertain the claimed scope of the invention.   Defendants also are entitled to summary judgment of no direct infringement because they do not supply the recited hardware and data feeds to any accused system.   Further, EPG cannot raise a disputed fact issue to withstand summary judgment on its indirect infringement claim because EPG has no evidence:

- that the deployments at PG&E, ISO-NE, FP&L, Dominion, or ATC collect "metrics" or synchrophasor data from the areas required by the claims,

- as to the '843 patent, that any accused system architecture is configured to operate on a plurality of different platforms by a plurality of different business systems or companies, or

- as to the '259 and '710 patents, that any customer has configured its system architecture with multiple PDCs.

Nor can EPG raise a disputed fact issue that the accused sales occurred at a time when Defendants had knowledge of the patents, especially the later '259 and '710 patents.

Thus, even aside from the issue of patent-eligible subject matter, Defendants are entitled to summary judgment of invalidity and non-infringement.

Date: November 3, 2014

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

By: _____
    Angel D. Mitchell
    (admitted *pro hac vice*)
Attorneys for Defendants ALSTOM,
S.A., ALSTOM Grid, Inc., Psymetrix
Ltd., and ALSTOM Limited

**PROOF OF SERVICE**

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is 5 Park Plaza, Suite 1600, Irvine, California, 92614.

On November 3, 2014, I served on the interested parties in said action the within:

**(1) DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT;**

**(2) DECLARATION OF ANGEL D. MITCHELL IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT;**

**(3) STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT;**

by placing a true copy thereof in a sealed envelope(s) addressed as stated on the attached mailing list.

☒     (MAIL) I am readily familiar with this firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

☐     (BY FEDERAL EXPRESS, AN OVERNIGHT DELIVERY SERVICE) By placing a true and correct copy of the above document(s) in a sealed envelope addressed as indicated above and causing such envelope(s) to be delivered to the FEDERAL EXPRESS Service Center, to be delivered by their next business day delivery service, to the addressee designated.

☐     (FAX) I caused such document(s) to be served via facsimile on the interested parties at their facsimile numbers listed on the attached service list on this date from fax machine telephone number (949) 475-0016. The facsimile numbers used complied with California Rules of Court rule 2.300 et seq. and 2.306 and no error was reported by the machine. Pursuant to California Rules of Court rule 2.306, I caused the machine to print a report of the transmission, a copy of which is attached to the original of this declaration.

☒     (E-MAIL) I caused such document(s) to be served via email on the interested parties at their e-mail addresses listed on the attached service list, pursuant to Stipulation of the parties.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 3, 2014, at Irvine, California.

Tony M. Diab
(Type or print name)

(Signature)

-1-

227590 v1

## SERVICE LIST

*Electric Power Group, LLC v. Alstom, S.A., et al.*
USDC Case No:  CV12-6365 JGB (RZx)

Art Hasan, Esq.
G. Warren Bleeker, Esq.
CHRISTINE, PARKER & HALE, LLP
655 North Central Ave., Suite 2300
Glendale, CA  91203-1445

Phone:  (626) 795-9900
Fax:  (626) 577-8800
Email:  art.hasan@cph.com
            warren.bleeker@cph.com

**Attorneys for Plaintiff**
**Electric Power Group, LLC**

-2-

227590 v1