Jamie H. Kitano (SBN: 268078)
jkitano@shb.com
SHOOK, HARDY & BACON L.L.P.
1 Montgomery, Suite 2700
San Francisco, California 92614-2546
Telephone:   415.544.1900
Facsimile:   415.391.0281

Douglas W. Robinson (SBN: 255909)
dwrobinson@shb.com
Tony M. Diab (SBN: 277343)
tdiab@shb.com
SHOOK, HARDY & BACON L.L.P.
Jamboree Center
5 Park Plaza, Suite 1600
Irvine, California 92614-2546
Telephone:   949.475.1500
Facsimile:   949.475.0016

Peter Strand (*pro hac vice*)
pstrand@shb.com
Angel D. Mitchell (*pro hac vice*)
amitchell@shb.com
Chrissie Guastello (*pro hac vice*)
cguastello@shb.com
Chris Dove (*pro hac vice*)
cdove@shb.com
SHOOK, HARDY & BACON, L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
Telephone:   816.474.6550
Facsimile:   816.421.5547

Attorneys for Defendants ALSTOM, S.A., ALSTOM Grid, Inc.,
Psymetrix Ltd., and ALSTOM Limited

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELECTRIC POWER GROUP, LLC,<br><br>    Plaintiff,<br><br>vs.<br><br>ALSTOM, S.A., et al.,<br><br>    Defendants | Case No: CV12-6365-JGB (RZx)<br><br>**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: December 22, 2014<br>Time: 9:00 a.m.<br><br>**Hon. Jesus G. Bernal** |

**TABLE OF CONTENTS**

I. Introduction ........................................................................................ 1

II. The Asserted Patents Claim Ineligible Subject Matter .............................. 1

    A. The Rationale Behind the Statutory Presumption of Validity Does Not Apply ........................................................................................ 1

    B. EPG Improperly Conflates § 101 Eligibility with Novelty Instead of Focusing on Preemption ........................................................................................ 2

    C. The Asserted Claims Add Nothing of Substance to the Abstract Idea of Integrating Known Elements of Power Grid Monitoring Systems Into a "Real-Time, Wide-Area" System ........................................................................................ 3

        1. "Real-Time, Wide-Area" and Multiple Data Sources ................ 3

        2. Derive Metrics ........................................................................................ 5

        3. Visualization Techniques ........................................................................................ 6

    D. EPG's Remaining Arguments are Without Merit ............................... 7

III. The "Metrics" Terms and "Applications" Claims Are Indefinite ............... 8

    A. The Monitored "Metrics" Terms Are Indefinite ................................. 8

    B. The "Applications" Claims in the '843 and '259 Are Indefinite .......... 9

IV. EPG Has Not Raised a Disputed Fact Issue Regarding Direct Infringement 9

V. EPG HAS NOT RAISED A DISPUTED FACT ISSUE OF INFRINGEMENT ................................................................................ 10

    A. PG&E's System Does Not Monitor a "Plurality of Control Areas" ... 10

    B. EPG Presents No Evidence that Any Accused System Meets the "Plurality of Different Platforms" Limitation ..................................... 11

    C. EPG Presents No Evidence that Any Accused System Receives a "Plurality of Data Streams" ................................................................ 11

    D. EPG Has Failed to Correlate Defendants' Alleged Specific Intent to the Dates of Each Accused Sale .............................................................. 12

VI. Conclusion ........................................................................................ 12

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
    728 F.3d 1336 (Fed. Civ. 2013) ............................................................................ 6

*Alice Corp. v. CLS Bank Int'l*,
    134 S. Ct. 2347 (2014) ..................................................... 1, 2, 3, 4, 6, 7, 8, 12

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
    No. 1:10cv910, 2014 WL 5430956 (E.D. Va. Oct. 24, 2014) .............................. 3

*Cal. Inst. of Tech. v. Hughes Commc'ns, Inc.*,
    No. 2:13-cv-07245, 2014 WL 5661290 (C.D. Cal. Nov. 3, 2014) ........... 1, 2, 5, 6

*Catalina Mktg., Int'l, Inc. v. Coolsavings.com, Inc.*,
    289 F.3d 801 (Fed. Cir. 2002) ............................................................................ 10

*Diamond v. Diehr*,
    450 U.S. 175 (1981) ................................................................................ 3, 5, 6, 7

*Enfish, LLC v. Microsoft Corp.*,
    No. 2:12-cv-07360, at *12 (C.D. Cal. Nov. 3, 2014) ........................................ 12

*Engate, Inc. v. Esquire Deposition Servs., LLC*,
    236 F. Supp. 2d 912 (N.D. Ill. 2002) ................................................................... 4

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
    535 U.S. 722 (2002) ............................................................................................ 8

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    131 S. Ct. 2060 (2011) ...................................................................................... 12

*Helios Software, LLC v. SpectorSoft Corp.*
    No. 12-081, 2014 WL 4796111, at *17 (D. Del. Sept. 18, 2014) ....................... 6

*Hughes Aircraft Co. v. United States*,
    No. 426-73, 1982 WL 36740 (Ct. Cl. Sept. 1, 1982) .......................................... 4

*In re Bilski*,
    545 F.3d 943 (2008) ..................................................................................... 1, 12

*In re INSLAW, Inc.*,
    83 B.R. 89 (B.R. Colo. 1988) .............................................................................. 4

*Interval Licensing LLC v. AOL, Inc.*
    766 F.3d 1364 (Fed. Cir. 2014) ............................................................................. 9

*Interwoven, Inc. v. Vertical Computer Sys.*,
    No. CV 10-04645, 2014 WL 490996 (N.D. Cal. Feb. 4, 2014) ........................... 9

*Kuba v. Sea World, Inc.*,
    428 Fed. Appx. 728, 732 (9th Cir. 2011) ............................................................ 2

*McRo, Inc. v. Sega of Am., Inc.*,
    No. CV 12-10327, 2014 WL 4749601 (C.D. Cal. Sept. 22, 2014) .............. 2, 5, 7

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014) ..................................................................................... 8, 9

*Parker v. Flook*,
    437 U.S. 584 (1978) .......................................................................................... 5, 6

*Rannoch, Inc. v. Rannoch Corp.*,
    52 F. Supp. 2d 681 (E.D. Va. 1999) .................................................................... 4

*Registration Control Sys., Inc. v. Compusystems, Inc.*,
    1990 WL 8671 (N.D. Ill. 1990) ........................................................................... 4

*WildTangent, Inc. v. Ultramercial, LLC*,
    134 S. Ct. 2870 (2014) ......................................................................................... 2

*Ultramercial, Inc. v. Hulu, LLC*,
    722 F.3d 1335 (Fed. Cir 2013) ............................................................................ 8

*Ultramercial, Inc. v. Hulu, LLC*,
    No. 2010-1544, 2014 WL 5904902 (Fed. Cir. Nov. 14, 2014) .................... 2, 4, 7

**OTHER AUTHORITIES**

FED. R. EVID. 902(5) ................................................................................................. 2

## I. Introduction

EPG's opposition confirms that the asserted claims merely integrate known power grid monitoring system elements into a "real-time, wide-area" system. (EPG Opp'n, at 2.) The claims recite this § 101 abstract idea and state "apply it with a computer." The patents attempt to preempt the very idea of "real-time, wide-area" power grid monitoring. These patents were prosecuted during a bygone era when patentees relied on a result-oriented bar to obtain USPTO approval. But the rules changed in *Bilski*, *Mayo*, and *Alice*, and the asserted claims do not satisfy the new law.

Even beyond the threshold issue of § 101, EPG's patents are indefinite because they rely on "metrics" and other terms without any clear boundaries to the scope of the invention. Further, EPG has not presented disputed fact issues of infringement. Infringement requires a customer's system being coupled to an infringing architecture, and EPG has not presented such evidence for any customer.

## II. The Asserted Patents Claim Ineligible Subject Matter

Patent claims are invalid under § 101 if they add no substance that purports to "improve the functioning of the computer itself." *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2359-60 (2014). EPG's patents do not clear the § 101 hurdle. "Instead, the claims at issue amount to 'nothing significantly more' than an instruction to apply the abstract idea of [real-time, wide-area monitoring] using some unspecified, generic" computerized environment. *Id.* (quotation omitted). Such patent drafting designed to monopolize the abstract idea is the very practice forbid in *Alice*.

### A. The Rationale Behind the Statutory Presumption of Validity Does Not Apply

EPG focuses on the statutory presumption of validity for an issued patent and the consequent "clear and convincing evidence" standard. But ineligibility under § 101 is a question of law. *In re Bilski*, 545 F.3d 943, 951 (2008). Another court in this district has therefore recognized the incongruity of applying this presumption. *See Cal. Inst. of Tech. v. Hughes Commc'ns, Inc.*, No. 2:13-cv-07245, 2014 WL 5661290, at *2 n.6 (C.D. Cal. Nov. 3, 2014). The court nevertheless believed that it was bound

by the Federal Circuit's holding that a challenger must prove ineligibility under § 101 by clear and convincing evidence. *Id.* (citing *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1339 (Fed. Cir 2013) [hereinafter *Ultramercial II*]). But the Supreme Court vacated *Ultramercial II*. *WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014). It is therefore no longer good law.

On remand, the Federal Circuit panel majority did not re-address this issue. *Ultramercial, Inc. v. Hulu, LLC*, No. 2010-1544, 2014 WL 5904902, at *1 (Fed. Cir. Nov. 14, 2014) [hereinafter *Ultramercial III*]. But Judge Mayer's concurring opinion explains that no presumption of eligibility applies to the § 101 inquiry. The rationale for the presumption is that the United States Patent & Trademark Office ("PTO") approved the claim, that rationale is diminished where the PTO has not properly considered an issue, and the PTO has for many years "applied an insufficiently rigorous subject matter eligibility standard." *Id.* at *9. The Supreme Court has "unequivocally repudiated the overly expansive approach to patent eligibility." *Id.* "Although the Supreme Court has taken up several section 101 cases in recent years, it has never mentioned—much less applied—any presumption of eligibility." *Id.*

This court is the first to examine the asserted patents in view of *Alice*. A PTO memorandum on June 25, 2014, outlined new patent examination procedures for computer-implemented inventions in light of *Alice*.[1] So no legitimate reason exists to defer to the PTO's examination based on now-obsolete legal standards.

### B. EPG Improperly Conflates § 101 Eligibility with Novelty Instead of Focusing on Preemption

EPG argues the claimed inventions are novel over the prior art. (Opp'n at 7; Winter Decl. ¶ 47.) But this argument is legally irrelevant and only serves to illustrate the importance of carefully evaluating the claims under the *Alice* framework.

---

[1] *See* http://www.uspto.gov/patents/announce/alice_pec_25jun2014.pdf. As a document from a .gov website, this is self-authenticating under Federal Rule of Evidence 902(5). *Kuba v. Sea World Inc.*, 428 Fed. Appx. 428, 32 (9th Cir. 2011). The court may take judicial notice of it. *See McRo, Inc. v. Sega of Am., Inc.*, No. CV 12-10327, 2014 WL 4749601, at *5 (C.D. Cal. Sept. 22, 2014) (discussing this memorandum).

2

"The 'novelty' of any element or steps in a process, or even of the process itself, is of **no relevance** in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter." *Diamond v. Diehr*, 450 U.S. 175, 188-91 (1981) (emphasis added); *see also Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, No. 1:10cv910, 2014 WL 5430956, at *11 (E.D. Va. Oct. 24, 2014) (plaintiff's argument that it developed a new process "misses the point"). The concern of § 101 is not novelty, but preemption. *Alice*, 134 S. Ct. at 2354-55. Claims to abstract ideas preempt the "building blocks" of scientific research. *Id.* By sweeping too broadly, they disproportionately tie up use of the underlying ideas and prevent others from performing research and implementing actual solutions, thereby thwarting innovation. *Id.*

EPG argues that the August 14, 2003 blackout report described the need for improved visualization capabilities over a wide geographic area, which Mr. Winter contends the claimed system fulfills. (EPG Opp'n, at 10; Winter Decl. ¶¶ 23-26.) Yet this report recognizes this is a "recurrent theme in blackout investigations"; "wide-area tools to aid situational awareness (e.g., real-time phasor measurement systems) have been tested in some regions but are not yet in general use"; and "[i]mprovements in this area will require significant new investments involving existing or emerging technologies." (Winter Decl. Ex. K, at EPG25833.) And EPG now purports to have a monopoly on any "real-time, wide-area" system via patent claims that add nothing of substance to improve the functioning of a computer to achieve those goals. EPG is therefore claiming a patent monopoly that is not commensurate with its contribution to the field, while thwarting innovation via broadly drafted claims.

C. **The Asserted Claims Add Nothing of Substance to the Abstract Idea of Integrating Known Elements of Power Grid Monitoring Systems Into a "Real-Time, Wide-Area" System**

1. **"Real-Time, Wide-Area" and Multiple Data Sources**

EPG's brief identifies various features that EPG seems to contend meaningful tie down the claims to something more than the abstract idea. EPG's "real-time, wide-

3

1 area" theme falls squarely within *Alice*, in which "the claims 'add[ed] nothing of
2 substance to the underlying abstract idea.'" *Ultramercial III*, 2014 WL 5904902, at
3 *2 (citing *Alice*, 134 S. Ct. at 2359-60).

4     The claims simply state the idea of a "real-time" system. Real-time systems are
5 conventional computer technologies.[2] The specification recognizes that control room
6 operators already had access to existing Level 2-SCADA systems, "which involves
7 controlling … and … switching in real-time." ('843 Pat. at 6:47-55 & Fig. 2B.) It
8 distinguishes "real-time" from "historical" data (*id.* at 7:40-41), and recognizes that
9 "real-time may be 1-4 seconds snapshot or up to 5 to 10 minute snapshots" (*id.* at
10 8:55-57). It further recognizes phasor-based technologies as known elements of
11 power grid monitoring systems that could be integrated into the claimed system. (*Id.*
12 at 7:7-11 (one embodiment may include "improved phasor and PDC hardware"), 8:58-
13 64 (same, in which the system can be integrated with SCADA, EMS, PMUs-PDCs, or
14 other control power systems), 9:32-61 (discussing dynamic monitoring using phasor
15 analysis as a known technology), Fig. 2B (recognizing "synchronized phasor
16 measurements" as known inputs).) The claims add nothing of substance to limit this
17 abstract idea of "real-time." They therefore preempt the field of real-time monitoring
18 systems without making a commensurate contribution of any inventive step.

19     The claims also add nothing of substance to wide-area network technologies.
20 They recite a "computer" receiving data from defined areas (e.g., multiple control
21 areas, transmission companies, utilities, etc.) such as via an "interface." The idea for
22 visualizing a different control area (claim 1 of the '843 patent) merely recites a display

---

[2] *See, e.g.*, *Engate, Inc. v. Esquire Deposition Servs., LLC*, 236 F. Supp. 2d 912, 915 (N.D. Ill. 2002) (patent infringement case involving real-time court reporting systems and software); *Rannoch, Inc. v. Rannoch Corp.*, 52 F. Supp. 2d 681, 682 (E.D. Va. 1999) (noting the plaintiff developed real-time systems for certain industries); *Registration Control Sys., Inc. v. Compusystems, Inc.*, 1990 WL 8671, at *6 (N.D. Ill. 1990) (observing the use of interrupts in a real-time system was a known technique in the computer industry); *In re INSLAW, Inc.*, 83 B.R. 89, 94 (B.R. Colo. 1988) (noting a particular software package was redesigned and reprogrammed in 1976 to become "an on-line real time" system); *Hughes Aircraft Co. v. United States*, No. 426-73, 1982 WL 36740, at *35 (Ct. Cl. Sept. 1, 1982) (patent infringement case involving real-time spacecraft systems).

4

1 computer "adapted to enable" an operator to monitor another control area without
2 stating how to accomplish this. The claims disclose no improved functioning in how
3 to scale up a local-area system into a wide-area system.

4       EPG also relies on claim language that requires data to come from multiple data
5 sources. Claim 1 of the '843 patent recites a computer that monitors metrics over
6 multiple control areas "operated on a plurality of different platforms by a plurality of
7 different business systems or companies." Claim 9 of the '710 patent recites receiving
8 data from "a plurality of non-grid data sources." Again, the claims merely recite
9 generic interfaces or, in other words, generic computer components.

### 2. Derive Metrics

11       EPG also maintains that the various "derive … metrics" limitations and
12 "analyzing the data"-type limitations are not abstract. But they are merely software
13 described at a high level of generality. "The essence of software is manipulating
14 existing data and generating additional data through algorithms." *Cal. Inst. of Tech.*,
15 2014 WL 5661290, at *9 ("All software *only* 'receives data,' 'applies algorithms,' and
16 'ends with decisions.' That is the only thing software does.").

17       The Supreme Court has endorsed the level of granularity sufficient for software
18 patent eligibility. In *Diamond v. Diehr*, the Court found patentable a computer-
19 implemented process for curing synthetic rubber in which temperature measurements
20 were fed to a computer that repeatedly calculated the remaining cure time by using a
21 mathematical equation set forth in the claim. 450 U.S. 175, 181 n.5 (1981). In
22 contrast, the Supreme Court found ineligible the method for computing an updated
23 alarm limit set forth in *Parker v. Flook*, 437 U.S. 584 (1978). There, the claim recited
24 a formula, but did not explain how the variables to be used in the formula were to be
25 selected. *Id.* at 586, 596-97 (Appendix A); *see also McRo, Inc.*, 2014 WL 4749601, at
26 *10-*11 (claims directed to rules-based approach were insufficient where the claims
27 broadly covered all rules). The court must ask whether the formula recited in the

claim constitutes an inventive concept that sufficiently limits the claim's preemptive effect. *See Cal. Inst. of Tech.*, 2014 WL 5661290, at *16.

The data processing in EPG's claims is recited in such conclusory fashion that it has broad preemptive effect. It bears no resemblance to the claims in *Diehr* and is even more generalized than the ineligible claims in *Flook*. For example, claim 1 of the '259 instructs that "the monitor computer derives … dynamic stability metrics including phase angles, damping, oscillation modes, and sensitivities … indicative of grid stress or instability." Similarly, claim 12 of the '710 patent broadly claims a method that includes "analyzing events … based on … limits, sensitivities and rates of change." Other generically described programming abounds. This broadly preempts innovation regarding a vast array of programming, despite the fact that the claims recite no technological advance whatsoever in implementing such algorithms.

### 3. Visualization Techniques

EPG's contention that the visualization features are novel improperly attempts to divert attention from the actual language of the asserted claims. EPG relies on Mr. Winter's declaration to the effect that the visualization features are more "advanced" and "meaningful." (Winter Decl. ¶¶ 30-33.) Yet he reaches this opinion by relying not on the language of the claims, but rather on the specification. (*Id.* ¶ 30 (citing Figs. 16-27, 29, 31 & 34-38 of the '259 patent).) *Alice* instructs court to focus on "the claims at issue." 134 S. Ct. at 2355; *see also Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Civ. 2013) (rejecting complex specification because the "the important inquiry" for § 101 "is to look to the claim").[3,4]

---

[3] It appears that the court in one case relied on by EPG made the same mistake. The court in *Helios Software, LLC v. SpectorSoft Corp.* found that the asserted claims contained meaningful limitations by relying on the first and second columns of the patent. No. 12-081, 2014 WL 4796111, at *17 (D. Del. Sept. 18, 2014). Typically, this would be the specification because the asserted claims are at the end of a patent.

[4] The fact that Defendants later obtained their own patents on advanced visualization features is equally irrelevant. As one court pointed out, "even if Defendants' patents rise and fall with Plaintiff's, it is hard to fault anyone for seeking patents that may turn out to be invalid where the applicable standards are shifting and uncertain." *McRo, Inc.*, 2014 WL 4749601, at *8.

6

Defendants' opening brief explains that the claims recite geographic displays (maps), data panels (graphs and charts), text panels (words), and zoom features. Further, Defendants cited cases establishing the conventional nature of such displays.

### D. EPG's Remaining Arguments are Without Merit

EPG also points out that the claims must be considered as a whole. While this is true, *see Diehr*, 450 U.S. at 188, EPG fails to articulate any cogent explanation of how the claims here reflect anything other than the abstract idea already discussed.

Claim length is not the legal standard. The Federal Circuit affirmed a dismissal of claims that recited a lengthy, eleven-step process for distributing copyrighted media products over the Internet. *Ultramercial III*, at *1. The Federal Circuit concluded that the claim limitations did not transform the abstract idea into patent-eligible subject matter "because the claims simply instruct the practitioner to implement the abstract idea with routine, conventional activity." *Id.* at *4. Consulting and updating an activity log were "insignificant 'data-gathering steps'" that add nothing of practical significance. *Id.* (quoting *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1370 (Fed. Cir. 2011)). Likewise, the claimed system involves gathering, storing, processing, and displaying data—all described at a high level of generality.

EPG's argument that the claimed system is tied to the power grid is equally irrelevant. A patentee cannot circumvent the prohibition against abstract ideas by limiting the idea to a particular technological environment. *Alice*, 134 S. Ct. at 2358. A claim's use of the Internet adds nothing for § 101 purposes. *Ultramercial III*, at *4 ("Given the prevalence of the Internet, implementation of an abstract idea on the Internet . . . is not sufficient to provide any practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself."). The asserted claims' tie to the power grid is materially indistinguishable. The fact that the power grid is a "machine" does not satisfy the machine-or-transformation test. *Id.* at *6. The Court in *Ultramercial* rejected this argument based on the Internet because the claim

1 was "not tied to any particular **_novel_** machine or apparatus." *Id.* (emphasis added).
2 Like the Internet, the power grid is not a novel machine.

3 Lastly, the fact that subsecond synchrophasor measurements are too fast for a
4 human to comprehend is irrelevant. Although courts often have identified the generic
5 computerization of activities long performed by humans as an easy indicator of patent
6 ineligibility, the opposite is not true. The test for patent eligibility remains as set forth
7 in *Alice*. And, as set forth above, the claims do not satisfy the *Alice* framework.

## III. The "Metrics" Terms and "Applications" Claims Are Indefinite

9 "A patent holder should know what he owns, and the public should know what
10 he does not." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 535 U.S. 722,
11 731 (2002). It is not enough that patent claims have "*some* meaning." *Nautilus, Inc.*
12 *v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2130 (2014). A claim term is indefinite if
13 the Court cannot determine its boundaries with "reasonable certainty." *Id.* at 2129.
14 Absent such clarity, the public is left in a "zone of uncertainty," not knowing what is
15 claimed and what is still open. *Id.*

### A. The Monitored "Metrics" Terms Are Indefinite

17 A "zone of uncertainty" exists regarding the scope of the monitored "metrics"
18 terms. Taking "reliability metrics" as an example, EPG offers ever-shifting
19 definitions for the term. EPG has asserted that "reliability metrics" are: "'power flow
20 animation' and 'station voltages'"; "contingency analysis"; "'area voltage', 'station
21 voltage', and 'power flow animation'"; and "magnitude, phase angle, and frequency
22 metrics" [EPG SUF 35]; and "high or low frequency, high or low voltage, large phase
23 angle differences, angle sensitivities, overloads, and unplanned separations such as
24 islanding" [Dkt 191, EPG SUF 3]. EPG's expert has further testified that: "voltage is
25 one. Current or amps is another metrics. Phase angle separations. Dynamic stability.
26 Frequency deviations." [Dkt 187, Dfs SUF 37].

27 Now, EPG argues for the first time in its response that the Court should look to
28 the patent specification for the term's scope. But the specification does not disclose

8

"reliability *metric*." It addresses "reliability *applications*" and discloses *yet another* meaning: "real-time monitoring of voltage/volt-ampere reactive (VAR), Area Control Error (ACE)/Frequency, Area Interchange Error (AIE)/Schedules, and/or other grid attributes and performance metrics." [EPG SUF 35].

EPG—the patent holder—does not even seem to know what it owns. Every time asked to detail the boundary of the invention, it offers a different answer. These inconsistent and imprecise definitions illustrate the "zone of uncertainty" that the Supreme Court expressly prohibited in *Nautilus*. The public (including Defendants) has no fair notice as to what EPG does and does not own.

### B. The "Applications" Claims in the '843 and '259 Are Indefinite

EPG's response only reinforces the conclusion that these claims are indefinite. EPG asserts that the claims depend on "the freedom of the operator" to monitor what he or she chooses. Thus, just as the Federal Circuit explained in *Interval Licensing LLC v. AOL, Inc.*, such subjective terms are indefinite because they depend on the "unpredictable vagaries of any one person's opinion." 766 F.3d 1364, 1373-74 (Fed. Cir. 2014). They do not provide the public with "reasonable certainty" as to when it would be infringing these claims.

### IV. EPG Has Not Raised a Disputed Fact Issue Regarding Direct Infringement

Defendants' accused software alone does not infringe EPG's patents, nor does merely installing and operating software on a computer. The accused system also must pull data from a PMU/PDC infrastructure in ways that meet several claim limitations.[5] For example, an operator must use its system to monitor a "plurality of control areas" in order to infringe the '843 patent. The operator also must operate the system on a "plurality of platforms." To infringe the '259 and '710 patents, the operator's infrastructure must include a "plurality of data streams" interfaced to the system. But EPG has failed to provide evidence that Defendants or any accused

---

[5] Due to the many non-infringing uses, *Interwoven, Inc. v. Vertical Computer Sys.*, No. CV 10-04645, 2014 WL 490996, at *1 (N.D. Cal. Feb. 4, 2014), is inapplicable.

9

customers operate the accused software to perform realtime monitoring (i.e., live data) on a PMU/PDC infrastructure that meets the limitations of the asserted patents.

EPG's attempt to shortcut its way to direct infringement via the installations at PEAK and ISO-NE is insufficient to satisfy its summary judgment burden.[6] EPG has the burden to establish that each and every claim limitation is met to prove infringement. *Catalina Mktg., Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 812 (Fed. Cir. 2002). However, EPG fails to meet its burden because it does not even bother to identify *what patent or what claim* Defendants supposedly infringe.

EPG argues that Defendants have directly infringed an unidentified claim of an unidentified patent because they 'assisted' with the installation or testing of PEAK's and ISO-NE's systems. EPG's paucity of evidence does not come close to satisfying its burden. EPG fails to present any evidence of that Defendants performed "real time" monitoring across a "plurality of control areas" on a "plurality of different platforms" or on a system with an interface to a "plurality of data streams."[7] EPG's hand-waiving allegation of "assistance" falls well short of its burden to provide evidence of how each limitation in a claim has been met.

## V. EPG HAS NOT RAISED A DISPUTED FACT ISSUE OF INFRINGEMENT

EPG has failed to present evidence that the PMU/PDC infrastructure at MISO, PEAK, ISO-NE, and PG&E meet the required claim limitations.[8]

### A. PG&E's System Does Not Monitor a "Plurality of Control Areas"

In response to Defendants' motion that the customers that do not monitor a "plurality of control areas," EPG attempts to defend only its accusations against

---

[6] EPG's offers no evidence or even argument regarding installations at MISO, PG&E, ATC, Dominion, FP&L, or National Grid. On that basis alone, Defendants are entitled to summary judgment of no direct infringement for those installations.

[7] EPG also cannot demonstrate Defendants' direct infringement because, as explained below, no customer has a network infrastructure that meets the claim limitations.

[8] EPG has offered no evidence that ATC, Dominion, FP&L, and National Grid infringe any patent or that ISO-NE infringes the '843 patent. Defendants are therefore entitled to summary judgment of no indirect infringement for those installations.

PG&E.[9] But EPG misrepresents PG&E's testimony. PG&E testified that it monitors only its own facilities in its own footprint. [EPG SUF 73-74]. No genuine issue of material fact exists.

### B. EPG Presents No Evidence that Any Accused System Meets the "Plurality of Different Platforms" Limitation

EPG argues that "platforms" refers to "different data sources." Even by that definition, EPG fails to provide evidence that this limitation has been met for *any* customer.

EPG contends that the systems at MISO, PEAK, and ISO-NE meet this limitation because they use a "PhasorData database and a historian (or PI) database." But all three customers testified to the contrary. MISO and ISO-NE use PhasorPoint's Historian feature and then have a database for storing data. [EPG SUF 82, 84]. Historian is a software application that works with the database; it is not itself a physical database. [EPG SUF 82]. PEAK testified that it chose not to use the PhasorPoint Historian feature and instead uses an application from another vendor. [EPG SUF 83]. Consequently, the only "platform" that these three customers use is a software application (PhasorPoint's Historian or a third party's application) that interfaces with a physical database that stores data.

### C. EPG Presents No Evidence that Any Accused System Receives a "Plurality of Data Streams"

The asserted claims of the '259 and '710 patents require the system to receive a "plurality of data streams." Further, "*each* data stream" must consist of synchronized phasor measurements, and "*each* data stream" must consist of measurements collected over a wide area. Thus, "*each* data stream" must come from a PDC, which synchronizes phasor measurements from multiple PMU units. Thus, a customer's infrastructure must include multiple PDCs in order to provide a "plurality of data

---

[9] EPG's attempt to re-write the meaning of "wide area" is addressed in Defendants' *Markman* briefing.

11

streams." EPG has presented no evidence that any customer deployed multiple PDCs that interface with its accused system.

### D. EPG Has Failed to Correlate Defendants' Alleged Specific Intent to the Dates of Each Accused Sale

Defendants also sought summary judgment of no indirect infringement on the basis that "knowledge" is an essential element of indirect infringement. EPG's response fails to meet its summary judgment burden by correlating any actions allegedly taken by Defendants to induce or contribute to customers' alleged infringement to a point in time when Defendants had knowledge of each respective asserted patent. EPG attempts to modify the salient "knowledge" dates based on the willful blindness theory set forth in *Global-Tech Appliances, Inc. v. SEB S.A.,* 131 S. Ct. 2060, 2068 (2011). But regardless of these modified "knowledge" dates, EPG fails to raise a disputed fact issue sufficient to withstand summary judgment. EPG does not identify the date of each accused sale. Consequently, even viewing the record in the light most favorable to EPG, it is devoid of evidence from which a rational trier of fact could find that any particular accused sale occurred at a point in time when Defendants could be charged with knowledge (or even willful blindness) of the '843, '259, or '710 patents, respectively.

## VI. Conclusion

The Court should grant Defendants' motion that the asserted patents are invalid under § 101. If the Court moves beyond this threshold test, it should rule that the "metrics" terms and "applications" claims are invalid as indefinite. Finally, the Court should rule that EPG has failed to carry its burden to present disputed issues of fact of infringement.

Dated:  December 8, 2014        SHOOK HARDY & BACON L.L.P.


By: _____*/s/ Tony Diab*_____
  Tony M. Diab
  Attorneys for Defendants ALSTOM S.A.,
  ALSTOM Grid, ALSTOM Limited and
  Psymetrix Limited

**CERTIFICATE OF SERVICE**

I certify that on December 8, 2014, pursuant to Federal Rules of Civil Procedure, a true and correct copy of the foregoing document described as REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR CLAIM CONSTRUCTION was served on the parties in this action by E-Mail:

G. Warren Bleeker
Kyle W. Kellar
Katherine L. Quigley
Christie Parker and Hale LLP
655 North Central Avenue Suite 2300
Glendale, CA  91203

Tel: 626-795-9900
Fax: 626-577-8800
warren.bleeker@cph.com
kyle.kellar@cph.com
katherine.quicley@cph.com

**(Attorneys For Electric Power Group LLC)**

I declare that I am a member of the bar of this Court. Executed on December 8, 2014 at Glendale, California.

                                                  */s/ Tony M. Diab*____